# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* L. L. MELENDEZ, Minor.

UNPUBLISHED
September 18, 2018

No. 338076
Wayne Circuit Court
Family Division
LC No. 16-523785-NA

*In re* A. J. MELENDEZ, Minor.

No. 338079
Wayne Circuit Court
Family Division
LC No. 16-523893-NA

Before: O'CONNELL, P.J., and CAVANAGH and SERVITTO, JJ.

PER CURIAM.

Respondent-mother, D. Burroughs, and respondent-father, J. Hoffman, have one daughter between them, LM. Respondent-father also has an older daughter, AM, with non-respondent mother, B. Pac. In these consolidated appeals, respondents appeal as of right the trial court's orders terminating their parental rights to the children. The trial court terminated respondent-mother's parental rights to her daughter pursuant to MCL 712A.19b(3)(g) and (j). The court terminated respondent-father's parental rights to LM under MCL 712A.19b(3)(b)(*i*), (g), (j), (k)(*iii*), (k)(*iv*), and (k)(*v*). His parental rights to AM were only terminated under MCL 712A.19b(3)(b)(*i*), (k)(*iii*), (k)(*iv*), and (k)(*v*). Because we conclude that there are no errors warranting relief in either appeal, we affirm.

## I. GENERAL FACTUAL AND PROCEDURAL BACKGROUND

Respondents were in a relationship and living together for approximately four years when respondent-mother gave birth to their daughter, LM, in August 2016. According to respondent-mother, she received prenatal care and LM was born full-term, healthy, and with no complications. Respondents both attended routine visits with the pediatrician and LM was not, in general, a fussy newborn. Respondent-mother took a six-week maternity leave and then returned to her employment.

While respondent-mother was at work, respondent-father cared for LM. Although respondent-father was unemployed, he received Social Security benefits related to a cognitive

-1-

disability. Respondent-father's other child, AM, lived with her mother, but the child spent one night a week, and every other weekend, with respondent-father and respondent-mother.

In October 2016, when LM was 11 weeks old, respondents left LM in the care of respondent-father's mother, C. Goodman. LM was in Goodman's care from 3:00 p.m. on October 29, 2016, until approximately noon on October 30, 2016. Goodman testified that LM was happy and content during her entire stay. Neither respondent had any concerns about LM's condition after she returned from staying at Goodman's home.

On October 31, 2016, respondent-father, respondent-mother, and LM went to the home of respondent-father's sister to celebrate Halloween. During this visit, LM seemed happy and several witnesses, including respondents, testified that she was fine that day.

LM's crib was located in respondents' bedroom. During the middle of the night on November 1, 2016, LM woke up crying. According to respondent-mother, respondent-father got up with the baby, rocked LM back to sleep, placed her in bed with respondent-mother, and then he went to sleep on the couch in the living room. Respondent-father, however, recalled that he was not able to sooth LM, so he put her in bed with respondent-mother and then went to sleep on the couch. In any event, when respondent-mother woke up at 7:00 a.m. for work, she put a sleeping LM back in her crib, prepared for work, and then, before she left for the day, woke up respondent-father and instructed him to go back to the bedroom. When respondent-mother left for work at 7:30 a.m., both LM and respondent-father were asleep in the bedroom. Respondent-mother testified that she called home three times on November 1, 2016. During these calls, respondent-father reported that LM had been crying throughout the day, but he did not think anything of it.

According to respondent-father, at approximately 9:00 a.m., he and LM woke for the day. LM was fussy, but respondent-father was not concerned because "all babies are fussy at times." Respondent-father attempted to feed LM twice that day. LM typically finished a six-ounce bottle, but she did not finish either of the two bottles respondent-father attempted to feed her. Respondent-father also had a difficult time getting LM to take her nap. According to respondent-father, LM eventually fell asleep at about 4:00 p.m. Although he knew safe sleep practices recommended that a baby be placed on its back, respondent-father placed LM on her stomach. When respondent-father put LM down, he did not have any concerns related to LM's physical condition. However, approximately two to five minutes after he put her down, he returned to the crib to check on LM. Initially, respondent-father could not explain why he returned so quickly to check on his daughter. Later, however, he stated that he went back in so quickly after putting LM down because he realized that he needed to flip her over.

When he entered the bedroom, respondent-father said LM's name. He expected that she would move her arms or legs in response. When she did not, he gently touched her leg. When she still did not show any response, he picked LM up out of the crib. Respondent-father claimed that he picked LM up underneath her armpits and used his fingers to support her head. At that point, respondent-father could tell that LM was not breathing. According to respondent-father, he then gently shook her for two to three seconds. Again, LM did not respond. Then, respondent-father blew in LM's mouth, which caused LM to let out a small gasp. According to

respondent-father, he then realized that she needed medical attention so he put her in her car seat and headed to the hospital. Later, a coworker drove respondent-mother to the hospital.

Initially, LM was treated at Henry Ford-Wyandotte Hospital, but was later transferred to Children's Hospital of Michigan where she would remain until her discharge on November 15, 2016. During her admission, LM was diagnosed as suffering from a fractured clavicle, stretched ligaments in the neck, retinal bleeding, and bilateral subdural hematomas. LM's treating physicians all concluded that her injuries were caused by non-accidental trauma; specifically, vigorous shaking.

While LM was still hospitalized, a petition was filed requesting termination of respondents' parental rights to LM and termination of respondent-father's parental rights to AM at the initial dispositional hearing. Following a hearing, the trial court found that the statutory grounds for termination of respondents' parental rights had been established by clear and convincing evidence. Specifically, the court found that respondent-father physically abused LM and that respondent-mother was complicit in a cover-up. Thereafter, the court concluded that a preponderance of the evidence supported a finding that termination of respondents' parental was in LM's and AM's best interests. Accordingly, the court entered an order terminating respondents' parental rights to the children. This appeal followed.

II. ANALYSIS

A. INEFFECTIVE ASSISTANCE OF COUNSEL

For her first issue on appeal, respondent-mother argues that she was denied the effective assistance of counsel. This Court applies criminal law principles to claims of ineffective assistance of counsel in child protective proceedings. *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). This Court remanded this case for a *Ginther*[1] hearing at which respondent-mother's current appellate issues were considered. After the hearing, the trial court denied respondent-mother's motion for a new trial.

The issue of ineffective assistance of counsel is a mixed question of fact and law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012) (citation omitted). We review the trial court's findings of fact for clear error, and review questions of law de novo. *Id.* "To establish a claim of ineffective assistance of counsel, a [respondent] must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. In order to demonstrate that counsel's performance was deficient, the [respondent] must show that it fell below an objective standard of reasonableness under prevailing professional norms." *People v Riley (After Remand)*, 468 Mich 135, 140; 659 NW2d 611 (2003), citing *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984) and *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). Establishing prejudice necessarily requires demonstrating a reasonable probability that the result of the proceedings would have been different but for counsel's error. *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013).

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Respondent-mother first argues that she was denied the effective assistance of counsel because she and respondent-father were jointly represented by the same retained attorney at the dispositional hearing. We are not persuaded that trial counsel's joint representation constituted the ineffective assistance of counsel due to a conflict of interest.

At the outset, the record discloses that respondent-mother consented to the joint representation after being fully informed of the consequences and implications of joint representation. At the November 17, 2016 preliminary hearing, in respondent-mother's presence, the prosecutor questioned trial counsel's joint representation, and the trial court directed counsel to address the issue with his clients and further indicated that the court could appoint attorneys for respondents, if necessary. This issue was raised again at a January 5, 2017 pretrial hearing. The court advised respondents that a conflict of interest could exist or arise from the joint representation. Respondent-mother indicated that she had spoken with defense counsel and she did not believe there was a conflict in the joint representation. At the *Ginther* hearing, defense counsel testified that he discussed the potential conflict with both respondents. He further advised respondents that if they wanted a different attorney, they would be entitled to court-appointed counsel. In response, respondent-mother agreed that she wanted defense counsel to continue to represent both parents. At the *Ginther* hearing, respondent-mother did not produce evidence that she did not understand the consequences of her actions. Under the circumstances, respondent-mother should not now be permitted to complain that the dual representation deprived her of the effective assistance of counsel when she knowingly agreed to the joint representation. "Respondent may not assign as error on appeal something that she deemed proper in the lower court because allowing her to do so would permit respondent to harbor error as an appellate parachute." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011).

Furthermore, we find no substantive merit to respondent-mother's claim that the joint representation deprived her of the effective assistance of counsel. A respondent bears the burden of establishing the factual predicate for her claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Respondent-mother has not done so in this case. Specifically, she has not demonstrated that an actual conflict of interest existed during the joint representation or that any alleged conflict adversely affected her trial counsel's performance.

Representation of multiple respondents by one attorney can create a conflict of interest, but a conflict will not be presumed or implied. See, e.g., *People v Lafay*, 182 Mich App 528, 530; 452 NW2d 852 (1990). To establish the ineffective assistance of counsel in this regard, it must be shown that an actual conflict of interest existed and that this conflict adversely affected the adequacy of trial counsel's representation. *Id*. The lower court record does not demonstrate an actual conflict of interest. The defense theory of both respondents was that neither one of them abused LM. On multiple occasions, respondent-mother testified that she did not believe that respondent-father harmed their daughter. She further testified, as did respondent-father, that the paternal grandmother was the perpetrator of the abuse. During the entire hearing below, respondent-mother and respondent-father shared the same position. Based on the record, it is apparent that because of respondent-mother's steadfast support of respondent-father, no conflict of interest existed.

Further, respondent-mother has not established that any alleged conflict adversely affected trial counsel's representation. That is, trial counsel did not advance a position on behalf of one parent that compromised the other parent's interests. Respondent-mother specifically argues that because of the joint representation, trial counsel was not able to advise her to leave respondent-father. At the evidentiary hearing, however, defense counsel testified that he advised respondent-mother that her chances would be better if she were to separate from respondent-father. Then, at the beginning of the termination hearing, respondent-mother testified that she intended to plan with respondent-father and she hoped they would marry. By the end of the hearing, in her case-in-chief, respondent-mother tepidly testified that her priority was LM and she would and could plan by herself if that was required of her. Even then, she continued to assert that respondent-father did not harm LM and that she would still leave her child in his care. Respondent-mother has not demonstrated that a conflict of interest impaired trial counsel's ability to adequately represent her interests. Counsel did advise respondent-mother that she might fare better if she separated from respondent-father. Further, the record clearly demonstrates that respondent-mother was not willing to comply with the advice of counsel when given. Under these circumstances, respondent-mother has not established the factual predicate for her claim.

Because respondents shared the same position during the dual representation and there is no evidence that any actual conflict of interest impaired trial counsel's representation of his individual clients, respondent-mother has failed to establish ineffective assistance in this regard.

Next, respondent-mother argues that her trial counsel was ineffective for accepting the opinions of LM's treating physicians without consulting another medical expert or introducing contradictory evidence regarding the cause of LM's injuries. Specifically, respondent-mother asserts that trial counsel should have presented expert testimony and argued that LM's condition was attributable to birth trauma sustained 11 weeks earlier, as opposed to physical abuse. We conclude that respondent-mother has not established that trial counsel was ineffective in this regard.

The decision to call or not call an expert witness is presumed to be a matter of trial strategy. *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). Trial strategy is entitled to great deference and this Court will not substitute its judgment for that of trial counsel regarding matters of trial strategy. *People v Garza*, 246 Mich App 251, 255; 631 NW2d 764 (2001). "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004). The failure to call a witness only constitutes ineffective assistance of counsel if it deprives the respondent of a substantial defense. See *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) (citation and quotation marks omitted).

At the *Ginther* hearing, trial counsel testified that he concluded expert testimony would not be necessary in light of the defense respondents intended to mount. Trial counsel contacted David Moran at the University of Michigan Innocence Clinic. Moran, in turn, referred counsel to an expert who, while not a medical doctor, was an expert consultant in abusive head trauma cases. Counsel provided this individual with copies of LM's hospital records. After reviewing

the records, this consultant opined that the case was more about determining who abused LM rather than whether she was abused. Accordingly, the record indicates that trial counsel investigated the matter before settling on a trial strategy.

Trial counsel's strategy included accepting that LM was physically abused, but asserting that LM was injured while in the care of the paternal grandmother. Trial counsel concluded that pursuing this strategy would not require an expert because the opinions of the treating physicians would support this theory. LM's treating physicians testified to time frames in which the injuries could have occurred. All three of the doctors testified to an injury time-frame that included the days that LM was in the care of her grandmother.

We conclude that trial counsel's strategy was objectively reasonable. No less than three treating physician's opined that LM was a victim of physical abuse. Trial counsel sought the assistance of an expert and this expert reached the same conclusion. Respondent-father admitted on several occasions that he did in fact shake LM, but respondents attempted to minimize the severity of the shaking and the significance of this admission. When asked if he ever contemplated pursuing a theory that LM was suffering from birth trauma injuries as opposed to child abuse, trial counsel explained that there was no indication to support this theory. This too appears to be borne out by the record. According to respondent-mother, she received appropriate prenatal care and LM was born full-term, healthy, and with no complications. Respondents both attended routine visits with the pediatrician and LM was not, in general, a fussy newborn. Based on the information available, trial counsel's strategic decision to pursue a theory that LM was physically abused by someone other than respondents was objectively reasonable. Accordingly, the decision not to call an expert witness was similarly a matter of trial strategy.

Respondent-mother argues that trial counsel's failure to consult additional experts deprived her of a substantial defense. This is simply not supported by the record. In reality, respondent-mother is attempting to relitigate the matter with a new defense because the one mounted by trial counsel proved unsuccessful. In any event, respondent-mother still has not established that the failure to consult another medical expert or introduce contradictory evidence constituted the ineffective assistance of counsel. To prevail on this ineffective assistance of counsel claim, respondent-mother was required to produce evidence that, had trial counsel consulted additional medical experts, a different outcome would have been reasonably probable. Put another way, respondent-mother was required to provide credible evidence that LM's medical condition was caused by birth trauma. Respondent-mother has not met this burden.

Respondent-mother relies on the opinions of Dr. Douglas Smith, a retired pathologist. However, Dr. Smith's testimony and affidavit fall far short of establishing a medical opinion that LM's fractured clavicle, retinal hemorrhages, and subdural hematomas were attributable to birth trauma.[2] Dr. Smith opines, at most, that trial counsel should have consulted with several experts

---

[2] At the *Ginther* hearing, the trial court did not permit appellate counsel to fully explore Dr. Smith's opinion that LM's condition was caused by birth trauma. The court reasoned that the purpose of the evidentiary hearing was to explore the reasonableness of the defense mounted by trial counsel, not to relitigate the case with a new theory of defense. Nonetheless, Dr. Smith's

to acquire opinions regarding the nature of the injuries. However, there is no evidence that, had those experts been consulted, they would have reached the conclusion that the injuries were related to birth trauma. Indeed, Dr. Smith simply concluded that, in his opinion, "there are possible medical conditions that explained the findings" in this case. He then avers that "it is likely that they were caused by a birth injury that evolved into a chronic subdural hematoma, which presented to medical attention when she began to have seizures." However, even this opinion is less than credible under Dr. Smith's own reasoning. Dr. Smith is most critical of trial counsel's failure to seek expert review of several medical records, including respondent-mother's prenatal care and LM's birth. He testified that in order to give an opinion on the cause of LM's medical conditions, it would be absolutely necessary to review these records. Yet, Dr. Smith readily admits that he, himself, did not review the prenatal and birth records. Because he did not review the very records that he claimed were critical and essential to an expert opinion in this case, he was in no position to provide a reliable opinion on the cause of LM's injuries. Dr. Smith's affidavit is filled with nothing more than speculation and conjecture. Consequently, respondent-mother has failed to show that trial counsel's failure to call an expert or that retention of an expert would have changed the outcome. Respondent-mother has the burden of establishing the factual predicate for her ineffective assistance of counsel argument. See *Hoag*, 460 Mich at 6. She has not done so.

We also reject respondent-mother's reliance on *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), in support of her argument. That decision does not support the broad proposition advanced by respondent-mother that failure to call an expert witness in abusive head trauma cases constitutes the ineffective assistance of counsel. *Ackley* involved "the unexplained and unwitnessed death of a child[.]". *Id.* at 383. The prosecution argued that the defendant killed the child either by blunt force trauma or shaking. The defendant denied harming the child and asserted that she must have died by an accidental fall. *Id.* at 384. The prosecution called five medical experts to establish the cause of death. The defendant, in contrast, called no expert in support of his theory that the child's injures resulted from an accidental fall, although the court had provided funding for expert assistance. During the evidentiary hearing in *Ackley*, the defendant provided an affidavit from an expert pathologist who averred that he would have testified that the child's head injuries could not be attributed to shaken baby syndrome or abusive head trauma, but were caused by an accidental mild impact. Under these circumstances, the *Ackley* Court held that the defense's failure to call an expert to respond to the prosecution's medical testimony constituted the ineffective assistance of counsel. The Court did not conclude that all abusive head trauma cases require the defense to present expert medical testimony. Moreover, in contrast to *Ackley*, in which there were competing theories on the cause of death necessitating expert opinions and the defendant produced factual support for his theory that the child's injuries could be attributed to accidental impact, respondents in this case did not contest

---

opinions were explored and it is clear that, at most, he opined that trial counsel did not fully investigate other causes of the injuries. After further admonishment by the court, appellate counsel eventually ceased her line of questioning and commented that Dr. Smith's opinion was set forth in his affidavit, which had been provided to this Court. Thus, it is appropriate to examine the affidavit to evaluate the nature of Dr. Smith's opinions.

that LM's condition was caused by physical abuse. Furthermore, respondent-mother has not produced competent evidence to support her appellate contention that LM's medical condition was a result of birth trauma. Therefore, respondent-mother's reliance on *Ackley* is misplaced.

## B. STATUTORY GROUNDS

Both respondents argue that the trial court erred when it found that the statutory grounds for termination were established by clear and convincing evidence. We disagree. In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989) (citations omitted).

The trial court terminated respondent-mother's parental right to LM pursuant to MCL 712A.19b(3)(g) and (j). The court terminated respondent-father's parental rights to LM pursuant to MCL 712A.19b(3)(b)(*i*), (g), (j), (k)(*iii*), (k)(*iv*), and (k)(*v*), and terminated his parental rights to AM pursuant to those same grounds, except MCL 712A.19b(3)(g) and (j). These statutory grounds permit termination of parental rights under the following circumstances:

(b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

(*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

\* \* \*

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

(k) The parent abused the child or a sibling of the child and the abuse included 1 or more of the following:

\* \* \*

(*iii*) Battering, torture, or other severe physical abuse.

(*iv*) Loss or serious impairment of an organ or limb.

(*v*) Life-threatening injury.

After reviewing the record, we conclude that the trial court did not clearly err by finding that these statutory grounds were established by clear and convincing evidence.

At the outset, we note that respondent-father fails to specifically address the termination of his parental rights under MCL 712A.19b(3)(k)(*iv*) and (k)(*v*). "The failure to brief the merits of an allegation of error is deemed an abandonment of an issue." *In re JS & SM*, 231 Mich App 92, 98; 585 NW2d 326 (1998), overruled in part on other grounds by *In re Trejo*, 462 Mich at 353 n 10. Accordingly, we may assume that the trial court did not clearly err when it found clear and convincing evidence to terminate respondent-father's parental rights under MCL 712A.19b(3)(k)(*iv*) and (k)(*v*). See *In re JS & SM*, 231 Mich App at 98-99. Because only one statutory ground for termination must be established by clear and convincing evidence, respondent-father's failure to challenge the trial court's findings with respect to MCL 712A.19b(3)(k)(*iv*) and (k)(*v*) would preclude appellate relief with respect to his challenge to the statutory grounds. *Id*. at 98. Nonetheless, we are satisfied from our review of the record that the trial court did not clearly err when it found that each of the cited statutory grounds for termination were established by clear and convincing evidence.

The evidence overwhelmingly established that 11-week-old LM was the victim of severe physical abuse at the hands of respondent-father and that respondent-mother was complicit in the cover-up. When LM was admitted to the hospital on November 1, 2016, she was in critical condition. Her physical injuries included a fractured clavicle, retinal hemorrhaging, and bilateral subdural hematomas. Imaging showed inflammation of the ligaments in LM's neck, indicating that they had been stretched. As a consequence of damage to her optic nerves, LM suffered permanent vision impairment. It is likely that she will have long-term or permanent neurological deficits related to the damage to her brain. As a further consequence of the injuries, LM developed a seizure disorder that her physicians continue to treat with multiple anti-seizure medications. LM also requires physical therapy because the left side of her body does not function properly.

Moreover, there was overwhelming evidence that LM's injuries were caused by non-accidental trauma. The testimony of LM's treating physicians refutes any suggestion that LM's injures could have been self-inflicted, accidental, or related to birth trauma. All three physicians agreed that LM suffered abusive head trauma most likely caused by vigorous shaking. The pediatric critical care specialist who treated LM testified that the combination of injuries could only have occurred by someone forcefully shaking the infant.

Neither respondent took responsibility for injuring LM. Indeed, they persistently claimed that they had no idea how she sustained such severe trauma. The evidence, however, was sufficient to enable the court to conclude that LM was injured while in respondent-father's care. By all accounts, LM did not appear injured or in distress in the days preceding her hospitalization. On November 1, 2016, LM was left in respondent-father's care while respondent-mother was at work. Respondent-mother was not concerned about LM's condition when she left for the day.

Respondent-father's own testimony regarding the events that transpired further implicates him. Respondent-father told a police officer that LM, who was not normally fussy, was having a particularly difficult day. She was not feeding or napping in her usual manner. When he eventually put LM down at 4:00 p.m. for a nap, respondent-father almost immediately went back in to check on her. It was at this time that he allegedly found LM unresponsive. Respondent-father could not explain why he went back in to check on LM so quickly after putting her down. Only after prompting from his attorney did he eventually claim that he went back in simply to reposition LM onto her back. On several occasions, respondent-father admitted that he did, in fact, shake LM that day, although he asserted that he did so gently.

Respondents' actions in the days following November 1, 2016, are also compelling. Respondent-father admitted that respondent-mother suggested that they lie about what happened and say that LM hit her head on the crib. Further, when speaking to his sister, respondent-father's account of the events was inconsistent and illogical. He implored his sister to say good things about respondents to the investigators.

At trial, respondents argued that LM was injured while in the care of her grandmother. The treating physicians could not say precisely what day LM was injured; at best, they were able to provide a range that did include the time period when LM was with her grandmother, as well as her parents. However, there was clear and convincing evidence from which the court could conclude that it was not plausible that LM's grandmother was the perpetrator. First, respondents admitted that when LM returned home from her grandmother's care, she was fine. And she remained fine for two days. This is consistent with the grandmother's testimony that LM was content while in her care and that nothing unusual happened. Further, the critical care specialist opined that in light of the severity of the injuries, LM's behavior would have changed and her symptoms would have been quickly apparent. Indeed, considering the degree of injury, it would have been uncommon for there to be a delay in the onset of symptoms. Respondents claimed at trial that early on they disclosed their suspicions to Child Protective Services (CPS). However, the CPS specialist testified that she spoke to respondents no less than four times while LM was hospitalized and not once did they implicate the paternal grandmother. Based on the foregoing, there was clear and convincing evidence from which the court could conclude that respondent-father became frustrated with an irritable infant, and took this frustration out on the helpless child by shaking her vigorously back and forth. The evidence further established that respondent-mother participated in a cover-up by attempting to implicate a relative.

Moreover, the evidence persuasively demonstrated that respondent-mother was unlikely to protect LM from risks of harm in the future. It is undisputed that LM sustained severe injuries. Respondent-mother could articulate no plausible explanation for these injures. Despite overwhelming evidence of non-accidental injury, respondent-mother testified both at the beginning and the end of trial that she did not believe that respondent-father had harmed their daughter. Indeed, respondent-mother admitted that she would have no concerns in the future with leaving a child in respondent-father's care. Respondent-mother and respondent-father continued to live together and she hoped that someday they would marry. Respondent-mother's own admissions make it readily apparent that she is not willing to put her child's needs ahead of her own and, consequently, LM would be at risk of serious harm if returned to respondent-mother's care.

Based on the foregoing evidence, the trial court did not clearly err when it found clear and convincing evidence to terminate respondents' parental rights.[3]

## C.  BEST INTERESTS

Finally, both respondents challenge the trial court's finding that termination of their parental rights was in the children's best interests. We find no merit to these challenges. "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). Whether termination of parental rights is in the child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We review for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts Minors*, 297 Mich App 35, 42; 823 NW2d 144 (2012). The court may also consider psychological evaluations, the child's age, involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App at 131.

The trial court did not clearly err when it found that termination of respondent-mother's parental rights was in LM's best interests. LM was severely physically abused at the hands of her father. The evidence further showed that respondent-mother continued to deny the manner in which LM was injured, encouraged respondent-father to lie about the events, and sought to place blame on a relative. Moreover, respondent-mother continued her relationship with, and indeed wished to marry, the man who severely abused their 11-week-old infant. This is not the action of a parent who is willing to make the needs of her child paramount.

It is undisputed that after her child was removed, respondent-mother made efforts to demonstrate her parenting skills. She called the foster mother every day and kept in weekly contact with the caseworker. Respondent-mother was also patient and attentive at parenting time and she brought with her many of the necessities for caring for an infant. Nonetheless, respondent-mother has not demonstrated that she can or would protect her child and ensure her child's safety. Clearly, LM would continue to be at risk of harm if returned to respondent-mother's care. Accordingly, the trial court did not clearly err when it found that termination of respondent-mother's parental rights was in LM's best interests.

Turning to respondent-father, as discussed, LM suffered physical harm while in his care. This factor must weigh heavily in favor of terminating his parental rights to LM. More

---

[3] Both respondents argue that petitioner did not offer them reunification services. However, "[p]etitioner . . . is not required to provide reunification services when termination of parental rights is the agency's goal." *In re HRC*, 286 Mich App 444, 463; 781 NW2d 105 (2009).

compelling is that respondent-father has failed to take responsibility for his actions. Under these circumstances, the danger of continued physical abuse was simply too great. Therefore, the trial court did not clearly err when it found that termination of respondent-father's parental right to LM was in the child's best interests.

The court correctly recognized that additional factors would need to be considered relative to AM's best interests. This Court has held that a trial court has an obligation "to view each child individually when determining whether termination of parental rights is in that child's best interests." *In re Olive/Metts*, 297 Mich App at 42. AM was five years old when LM was injured. She lived with her biological mother, but visited respondent-father frequently and routinely. Respondent-father contributed to AM's financial needs. Several witnesses testified that respondent-father and AM shared a strong bond and that respondent-father's interaction with his daughter was appropriate. Notably, both counsel for the children and the non-respondent biological mother requested that the court not terminate respondent-father's parental rights to AM. Notwithstanding these requests, the court found that termination of respondent-father's parental rights was in AM's best interests. We agree. As the trial court noted, respondent-father caused severe and permanent injury to AM's sibling, denied that he did so, and then attempted to blame his own mother for the abuse. Despite the fact that AM would presumably be safe in her mother's care, there would still be the potential for interaction between respondent-father and his oldest daughter if his parental rights were not terminated. Given the continued danger of physical abuse in the home, AM would be at risk if respondent-father's parental rights remained intact. Accordingly, the trial court did not clearly err when it found that termination of respondent-father's parental rights was also in AM's best interests.

Affirmed.

/s/ Peter D. O'Connell
/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto